MCI TELECOMMUNICATIONS CORPORATION, Appellant,

v.

BOARD OF FRANKLIN COUNTY COMMISSIONERS et al., Appellees.

[Cite as *MCI Telecommunications Corp. v. Franklin Cty. Bd. of Commrs.* (1998), 127 Ohio App.3d 127.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APE07–960.

Decided March 31, 1998.

*Squire, Sanders & Dempsey, John R. Gall, Philomena Dane* and *Keith Shumate,* for appellant.

*Ronald J. O'Brien,* Franklin County Prosecuting Attorney, and *Harland H. Hale,* Assistant Prosecuting Attorney, for appellee Franklin County Commissioners.

*Porter, Wright, Morris & Arthur, Alvin J. McKenna, Samuel H. Porter, Scott E. North, Virginia E. Richards* and *Katerina Eftimoff,* for appellee Ameritech Ohio.

DESHLER, Presiding Judge.

This is an appeal by plaintiff, MCI Telecommunications Corporation ("MCI"), from a judgment of the Franklin County Court of Common Pleas, denying MCI's motion for injunctive relief and entering judgment in favor of defendants, Franklin County Board of Commissioners and Ameritech Ohio, Inc.

On June 30, 1997, MCI filed a complaint against the Franklin County Board of Commissioners ("Franklin County"), alleging that Franklin County had unlawfully awarded a contract for inmate and public telephone services and equipment to Ameritech Ohio, Inc. ("Ameritech").[1] MCI, which alleged that it had submitted the "highest and best" bid, sought injunctive and declaratory relief.

Portions of the following facts are based upon a limited stipulation of facts entered into between the parties. In March, 1997, Franklin County solicited sealed competitive bids regarding "INMATE/PUBLIC PAY PHONE AND LONG DISTANCE SERVICES AND PHONE EQUIPMENT" for the Franklin County Sheriffs and Commissioner's Department, pursuant to an invitation to bid ("ITB"). The ITB originally provided for bids to be received and opened by the Franklin County Purchasing Department on April 14, 1997, and for services solicited by the ITB to commence on or about May 30, 1997.

The ITB required bids for two particular services, described as follows:

"It is the intent of these specifications to set forth the minimum requirements for an authorized phone carrier to provide the following two services:

"A. Local, intralatta and interlatta collect call telephone service and basic telephone equipment for inmates of the Franklin County Corrections Centers (FCCC) I, II, Juvenile Detention Center (JDC) and Work Release Center.

"B. Local, intralatta and interlatta public pay phone service and basic telephone equipment located in Franklin County Government Buildings and on County property."

Within the meaning of the ITB, local service is service within the Columbus local access and transport area ("LATA"). A LATA is a geographical area within which a local telephone company may offer telecommunications services. Local service is service within the Columbus LATA that is not a toll (long-distance) call, while intra-LATA service is telephone service within the Columbus LATA that constitutes a toll call. Inter-LATA service is long-distance telephone service to points beyond the Columbus LATA.

The ITB set forth the following bid evaluation criteria:

"This bid will be awarded on an 'ALL or NONE' basis. Errors or omissions may result in your bid being disqualified. 'Highest and Best Bid' will be the sole criterion by which this bid will be awarded. The County will evaluate the bids based on the following criteria for the 'Highest and Best' bid in their judgment.

"1. Compliance with the bid specifications and general requirements listed.

---

1. On July 10, 1997, Ameritech was added as an intervening defendant in the proceedings pursuant to Civ.R. 24(A)(2).

"2.   Highest percentage of monthly gross revenues (commissions).

"3.   Time of delivery, setup and installation.   (A critical factor in the bid award.)

"4.   Guaranteed 24 hour response time, with same day or next day on site service by qualified technician.

"5.   Contractors proven previous experience with telephone systems in Correctional facilities of similar size and inmate population.

"6.   Contractors proven previous experience with public pay phone services.

"7.   References from similar facilities.

"8.   History of complying with regulations.

"All bid offers must remain open for sixty (60) days from bid opening date. However, the Franklin County Board of Commissioners reserves the right to reject any and all bids, to waive technicalities, and to request a rebid on the required item(s) in accordance with Sections 307.89 and 307.90 of the Ohio Revised Code."

The ITB provided that "[t]he telephone equipment and service must be provided by the successful contractor at no cost to Franklin County in exchange for the business opportunity to collect and share with Franklin County monthly phone revenues."   The ITB originally required bidders to quote a flat monthly percentage of gross revenues received by the telephone carrier in each month of the contract.

The ITB also required bidders to fill out a bid response sheet with respect to their percentage commission of quotations for the following categories of service: (a) "inmate telephone service," (b) "public pay phone service," and (c) "long distance (intra/interlatta) [*sic*] phone service."   The ITB stated that contractors "are required to quote firm and fixed rates for the initial contract period as designated on the Bid Response Sheet."   Further, in addition to standards set forth in the ITB, it was required that "each contractor must also adhere to the standards established by the Public Utilities Commission of Ohio (PUCO)."

A prebid conference was conducted by Franklin County on March 24, 1997. During this conference, several potential bidders raised questions regarding certain terms of the ITB. One of the issues raised involved MCI's concern over language in Section 00002, Subsection C of the ITB pertaining to rates for "inmate phone equipment systems features," which stated as follows:

"RATES: At all times, the rates charged by the contractor to the called party shall not exceed the dominant carrier rates (Ameritech, AT&T) for the same call distance, length of call, time of day and day of week.   These maximum allowable rates shall reflect the dominant carrier's local, intralatta, and interlatta rates in

effect at the time of the call. Franklin County will not provide rates to the contractor, thus it shall be the responsibility of the contractor to remain current on allowable rates. There shall be no add-ons such as service charges or surcharges, which are not in accordance with the dominant carriers tariffs."

Subsequent to the prebid conference, Franklin County issued two addenda to the ITB. Addendum 1, issued April 9, 1997, provided that "[b]ased on questions received and the need to clarify portion[s] of the bid specifications, the bid opening is extended to April 24, 1997." On April 11, 1997, Addendum 2 was issued, reflecting various amendments to the original ITB, including the following regarding the above quoted section on rates:

"Section 00002; Page 21, Sub-section C; Section 00003; Page 24, Sub-section D, the first sentence now reads, 'At all times, the rates charged by the contractor to the called party shall not exceed those rates establish [*sic* ] by the Ohio Public Utilities Commission (PUCO) for the same call distance, length of call time of day and day of week.' "

Addendum 2 also amended the original requirement that bidders quote a flat monthly percentage of gross revenues received by the carrier in each month. Specifically, the addendum stated that "the term 'gross revenues' shall be changed to 'gross billed revenues.' " The term "gross billed revenues" was defined as "[t]he gross total dollar amount of call records sent to the telephone companies for collections."

On April 24, 1997, several prospective bidders submitted responses to the ITB, including Ameritech and MCI. In its bid response, MCI offered the following commissions: (a) "47% Inmate Local and Long Distance," (b) "15% Public Phone Local Coin," (c) "36% Public Phone Long Distance," and (d) "25% MCI Calling Card and 1–800–COLLECT from Public Phones." MCI proposed a $2.50 surcharge for local and intra-LATA calls.

Ameritech offered commissions of forty-five percent for inmate local and intra-LATA calls, fifteen percent for public pay calls, thirty-four percent for long-distance public pay calls, and forty-four percent for inmate inter-LATA calls. Ameritech proposed a $1.10 charge for local calls and a $1.10 surcharge for intra-LATA calls.

On May 5, 1997, MCI and Ameritech were informed that they were finalists in the bidding process. On May 7, 1997, the two companies made presentations to Franklin County regarding their bids.

On May 14, 1997, Kenneth R. Williams, an employee of the Franklin County Purchasing Department, provided an analysis of the presentation and bids of MCI and Ameritech to Ann Tarrant, the Franklin County Purchasing Administrator. On May 22, 1997, Andre Gregory, an employee with the Franklin County

Public Facilities Management Office, contacted MCI and sought clarification of information provided in MCI's bid. On May 23 and May 27, 1997, MCI responded to Gregory in writing regarding certain issues pertaining to MCI's bid.

On May 27, 1997, Ameritech filed with the PUCO an application to place in effect its Ameritech Inmate Calling Service ("AICS") tariffs for local and intra-LATA collect calls from correctional facilities. On June 6, 1997, Ameritech advised Franklin County in writing that its proposed charge of $2.50 plus permanent rates for the new Ameritech Inmate Service had been approved by the PUCO.

On June 17, 1997, Franklin County adopted Resolution No. 548–97, finding that Ameritech had "timely submitted the highest and best bid." The resolution provided that "the bid proposal of MCI, Inc. was not in compliance with the bid specifications in that the surcharge that was bid exceeds the dominant carrier's tariff." On that date, Franklin County executed a contract with Ameritech.

MCI subsequently filed its complaint for injunctive relief with the trial court, and the court heard evidence on July 16, 1997. By judgment entry filed July 23, 1997, the trial court denied plaintiff's motion for preliminary and permanent injunctive relief.

On appeal, MCI sets forth the following assignment of error for review:

"The court below erred in denying MCI Telecommunications Corporation ('MCI') preliminary and permanent injunctive relief as well as a declaratory judgment because the Board of Franklin County Commissioners ('Franklin County') abused its discretion by failing to award the June 17, 1997 contract for Inmate/Public Pay Telephone and Long Distance Services and Telephone Equipment to MCI. MCI's bid, as the court below expressly found, met all of the specifications set forth in the Invitation To Bid ('ITB') respecting such contract and offered Franklin County by far the best financial package. MCI therefore was the highest and best bidder."

Appellee Ameritech has filed the following conditional cross-assignment of error, pursuant to R.C. 2505.22, to prevent reversal:

"The Trial Court's determination that Appellant MCI Telecommunications Corporation's bid complied with the specifications set forth in Franklin County's Invitation to Bid for Inmate/Public Pay Telephone and Long Distance Services and Telephone Equipment is contrary to the manifest weight of the evidence."

In *Wilson Bennett, Inc. v. Greater Cleveland Regional Transit Auth.* (1990), 67 Ohio App.3d 812, 821, 588 N.E.2d 920, 926, the court noted:

"Injunctive relief is the proper remedy for an unsuccessful bidder to bring against a contracting authority where it is alleged that a contract was unlawfully

awarded to another bidder. In order to prevail on a complaint seeking injunctive relief with respect to the award of a contract, the plaintiff must prove, by clear and convincing evidence, that: (1) the award of the contract constituted an abuse of discretion; and (2) the award of the contract resulted in some tangible harm to the public in general, or to the plaintiff individually." (Citation omitted.)

In the present case, MCI, noting that it offered commissions that were higher than those proposed by Ameritech, maintains that it submitted the highest and best bid. MCI argues that the trial court erred in finding that Franklin County did not abuse its discretion in awarding the contract for services to Ameritech where, it contends, Franklin County used unannounced criteria in denying MCI's bid.

In *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 21, 552 N.E.2d at 204–205, the Ohio Supreme Court discussed the role of a court in reviewing actions by city officials in the context of determining the lowest and best bidder for a contract, noting:

"Generally, courts in this state should be reluctant to substitute their judgment for that of city officials in determining which party is the 'lowest and best bidder.' 'The rule is generally accepted that, in the absence of evidence to the contrary, public officers, administrative officers and public boards, within the limits of the jurisdiction conferred by law, will be presumed to have properly performed their duties and not to have acted illegally but regularly and in a lawful manner. All legal intendments are in favor of the administrative action.' *State ex rel. Shafer v. Ohio Turnpike Comm.* (1953), 159 Ohio St. 581, 590, 50 O.O. 465, 469, 113 N.E.2d 14, 19. In *Altschul v. Springfield* (1933), 48 Ohio App. 356, 1 O.O. 522, 193 N.E. 788, the court explained how the bidding process should be construed, by noting:

" '* * * [W]hen the statute provides for the acceptance of the *lowest and best* bid the city is not limited to an acceptance of merely the lowest dollar bid.

" 'The statutes of this state as to most public work provided some years ago for the acceptance of only the lowest bid. That was subsequently amended so as to read "lowest and best bid." This amendment clearly indicates that the Legislature recognized that an element other than the mere low dollar bid often enters into the letting of a contract. Hence the amendment providing that the contract should be let to the lowest and best bidder followed.

" 'This amendment, therefore, places in the hands of city authorities the discretion of determining who under all the circumstances is the *lowest and best* bidder for the work in question.

" 'This discretion is not vested in the courts and the courts cannot interfere in the exercise of this discretion unless it clearly appears that the city authorities in whom such discretion had been vested are abusing the discretion so vested in

them.' (Emphasis *sic.* ) *Id.* at 362, 1 O.O. at 525, 193 N.E. at 790." (Citations omitted.)

MCI first contends that although the county amended the original ITB to delete a provision that rates charged to the called party shall not exceed the "dominant carrier rates (Ameritech, AT&T)," the county nevertheless disqualified MCI's bid proposal on that basis. Specifically, MCI points to language in the resolution providing that "the bid proposal of MCI, Inc. was not in compliance with the bid specifications in that the surcharge that was bid exceeds the dominant carrier's tariff." It is asserted that Franklin County's decisionmaking process was unreasonable, in that the county relied on a "non-existent, abandoned, industry standard" to impose a "dominant carrier" rate restriction on MCI.

In response, Ameritech argues that the addendum to the ITB regarding rates did not delete any requirements from the original ITB; rather, Franklin County removed language identifying Ameritech and AT&T as "dominant carrier[s]" from the ITB at MCI's request. However, Ameritech contends, the requirement that bids comply with the PUCO's rules and standards was always a part of the ITB, and Ameritech maintains that it was on that basis, *i.e.,* compliance with the PUCO's rules, that Franklin County evaluated the bids.

At the outset, it appears that the parties agree that the term "dominant carrier," while having legal significance under federal regulatory law, is not used as a term of art by the PUCO under Ohio's regulatory scheme. We note that the phrase "dominant carrier" is defined under the Code of Federal Regulations as "[a] carrier found by the Commission to have market power (*i.e.,* power to control prices)." Section 61.3(*o*), Title 47, C.F.R. MCI witness Judith Sanders, an attorney who specializes in public utility law, similarly testified that the term "dominant carrier," as used under federal communications law, "implies in a competitive field one carrier that would have market power and would be able to influence the rates of the other carriers."

Andre Gregory, the assistant project manager for the Franklin County Public Facilities Management Office, participated in drafting the ITB. During his deposition, Gregory was questioned as to why language pertaining to "dominant carrier" was included in the ITB. Gregory indicated that he became aware of the term by speaking with telephone contractors. Specifically, Gregory stated:

"That was a term that they all use and seemed to mean there was a definite dominant carrier out there. Whoever that dominant carrier was, we wanted to use them as a standard, because we didn't want any fly-by-night phone company coming in and charging these rates. * * *

"* * *

"* * * It was just assumed that—that there is a dominant carrier, and that entity can be picked out. We talked about dominant carrier as to who is—who's the, I guess, like well-known or things of that nature, but like a definition for dominant carrier, I personally didn't know who was a dominant carrier. I thought that it would possibly be Ameritech and AT&T."

Gregory stated that he "took the liberty * * * to set a standard and say Ameritech and AT&T will be what we, the County, consider to be the dominant carrier." Gregory subsequently spoke with a representative from the PUCO about obtaining information as to whether there was a provider that might be considered the "dominant carrier for phone services for local and intralatta calls." Gregory stated that "after talking with PUCO and with other contractors, [dominant carrier] seemed to mean to me * * * what phone company had the most service dealing with local and * * * intralatta and interlatta calls." Thus, language that the rates charged by the contractor shall not exceed dominant carrier rates was intended to "[s]et a standard" or ceiling for rates.

At a prebid meeting, MCI representative Michael Isler told Gregory that he did not feel that Ameritech and AT&T were the dominant carriers for *inmate* phone carriers. Isler informed Gregory that MCI was the "dominant carrier for inmate phone carrier[s] in Ohio." In response, Gregory spoke with a representative from the PUCO who "kept reiterating * * * that Ameritech is the dominant carrier for local and intralatta calls in the state of Ohio."

Gregory indicated that the addendum deleting the reference to Ameritech and AT&T as dominant carriers under Section 00002 of the ITB came in response to MCI's contention that it was the dominant carrier for inmate phone services. In his deposition, Gregory discussed the purpose of the addendum in light of MCI's assertion:

"[T]he goal we were trying to reach with that section was that at that time we couldn't confirm or deny that MCI was the dominant carrier for inmate phone service, and I stress inmate phone service. So we changed it to this so that we could refer to a governing authority that would know if they were.

"And * * * when that statement was made, I was confused, because I started thinking, well, I pretty much thought it was Ameritech and AT&T. Well, I was thinking along the terms of rates, who is the dominant carrier when dealing with rates and local intralatta and interlatta. I was not thinking along the terms of who was the dominant carrier for inmate phone services. That's the difference.

"At the time * * * who had the most telephones wasn't the issue we were trying to deal with * * *. However, I let that statement confuse me, and I wanted to make sure that we were fair to all of the contractors, you know, if

AT&T and Ameritech wasn't, and I'm not the governing authority over this, we'll have to refer to PUCO."

Gregory further stated that he equated the concept of dominant carrier with "LEC" or "local exchange carrier." Gregory was familiar with LECs from reviewing tariffs filed with the PUCO. MCI witness Judith Sanders, while stating that she "wouldn't equate a dominant carrier with a LEC," acknowledged that the local exchange carrier for local and intra-LATA calls was Ameritech. Further, when asked her opinion as to which local exchange carrier "dominates" in Franklin County, Sanders stated that "Ameritech Ohio in my opinion is still the monopoly service provider within its service territory in Franklin County."

In considering the evidence presented, we find unpersuasive MCI's assertion that Franklin County relied on an industry standard definition of "dominant carrier" to impose an arbitrary rate restriction on MCI; the record fails to indicate that Franklin County employed the term in such a manner. Rather, the record supports Ameritech's contention that Franklin County employed a plain-language interpretation of the meaning of the word "dominant," under which it sought to ascertain which telephone company was the dominant carrier for local and intra-LATA calls. Under this interpretation, we do not view as unreasonable the fact that Franklin County considered the LEC, or "local exchange carrier" to be the dominant carrier of local services.

█ Further, the fact that Franklin County may have interpreted the concept of dominant carrier in a different manner than MCI is not dispositive of the issue whether Franklin County abused its discretion in awarding the contract to Ameritech. " 'The exercise of an honest judgment, however erroneous it may seem to be, is not an *abuse of discretion.* Abuse of discretion * * * implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.' " *State ex rel. Shafer v. Ohio Turnpike Comm.* (1953), 159 Ohio St. 581, 590–591, 50 O.O. 465, 469, 113 N.E.2d 14, 19, quoting *People v. N.Y.C. Rd. Co.* (1864), 29 N.Y. 418, 431.

Upon review, we agree with Ameritech's contention that the record reflects that Franklin County evaluated the bids on the basis of compliance with the PUCO's rules and standards, such compliance being a specific requirement under the terms of the ITB. More specifically, the evidence presented indicates that Franklin County's primary concern in its consideration of MCI's bid was that its proposed rates for local and intra-LATA services, at the time the bids were opened, exceeded rates established by the PUCO.

In addition to deposition testimony by Franklin County employee Gregory on this issue, MCI's own witness, Michael Isler, testified that Franklin County had expressed concern to him, following submission of MCI's bid, that the rates

contained in MCI's bid exceeded those allowed by the PUCO. Specifically, Isler testified at trial that he received a telephone call from Gregory regarding the rates proposed by MCI. Isler stated that Gregory "highlighted to me that the local call surcharge and the intra-LATA surcharge of two fifty that we had proposed was higher than that of what Ameritech had proposed and he was curious about whether or not our rates were approved by the PUCO." Isler stated that he explained to Gregory that the rates "were not approved by the PUCO because they had not even been submitted to the PUCO for approval, for review and approval." Isler testified that the rates were "proposed rates," and that "our response to the invitation to bid under the rates section said that any rates that we would charge would be tariffed after approval from the PUCO and/or the FCC."

Isler testified that it was not his understanding that the ITB required rates to be approved by the PUCO at the time the rate schedule was submitted by MCI to the county. Isler acknowledged, however, on cross-examination, that at the time MCI's bid was submitted he was not aware of the approved maximum tariff for local and intra-LATA calls. Isler spoke with Gregory on May 30, 1997, and Gregory indicated that "the committee was considering whether or not MCI's bid was going to be determined to be compliant at all because these rates for local and intra-LATA calling that we had proposed were not * * * approved by the PUCO at the time that our response to the ITB was returned."

MCI witness Judith Sanders also acknowledged that MCI's proposed rates for local and intra-LATA calls were not approved at the time it submitted its bid. Specifically, Sanders testified that on the date the bids were submitted, MCI could not have charged $2.50 (as proposed in MCI's bid) for local and intra-LATA calls "because of the PUCO guideline for alternative operator service providers which caps the surcharge for local and intra-LATA calls placed from inmate facilities at what they call the LEC, which is the local exchange carrier's rates."

A copy of the PUCO's "Guidelines For the Provision of Competitive Telecommunication Services" was admitted at trial. The guidelines provide:

"D.   Rates and Charges

"* * *

"3.   Alternative Operator Services

"AOS, as defined in Case No. 88–560–TP–COI, shall be subject to certain price ceilings as set forth below.

"a.   Local operator-assisted calls:

"For local operator-assisted calls, the AOS provider shall not charge the billed party more than the LEC price list rates for a local operator-assisted call in the

same exchange. This requirement includes both the rates for MTS and operator surcharges.

"b. Secured facilities:

"For intraLATA, intrastate calls, the AOS providers serving secured inmate facilities shall not charge the billed party more than the LEC price list rates for an intraLATA, intrastate call. This requirement includes both the rates for MTS and operator surcharges. This requirement is only applicable in those situations where the billed party does not have access to other operator service providers (OSPs) for the call from the secured facility."

Thus, pursuant to the applicable guidelines, and as noted by Sanders, the PUCO guidelines preclude an "alternative operator services" provider from charging "more than the LEC price list rates" for local and intra-LATA calls. As previously noted, Ameritech is the LEC or local exchange carrier in Franklin County. Further, the record indicates that at the time the bids were submitted, the applicable tariff for local and intra-LATA calls was $1.10 per call.

■ In the present case, we find no error in the trial court's determination that Franklin County did not abuse its discretion in awarding the contract to Ameritech, despite MCI's proposed higher commissions. Pursuant to the terms of the ITB providing that "each contractor must * * * adhere to the standards established by the Public Utilities Commission," as well as Addendum 2, stating that "[a]t all times, the rates charged by the contractor * * * shall not exceed those rates establish[ed] by the Ohio Public Utilities Commission," contractors were on notice that the bids were subject to standards and rules established by the PUCO. At the time the bids were submitted, the rates for local and intra-LATA calls proposed by MCI exceeded rates allowed by the PUCO. Further, at the time Franklin County received the bids, MCI had not submitted to the PUCO a request for a waiver of the fixed rates.

Thus, an evaluation of the bid as submitted by MCI on April 24, 1997, was, of necessity, subject to conjecture, requiring Franklin County to take into consideration the amount of time it might take MCI to seek and gain approval for the proposed rates or, under the worst-case scenario, the possibility that the PUCO might not approve the surcharge at all. The record reflects that Franklin County was concerned about "time restraints surrounding the renovation project," and that it viewed possible delay in awaiting approval of MCI's proposed rates as "not * * * advantageous to the County." Moreover, attempting to evaluate bids based on circumstances which might arise after the award of a contract necessarily subjects the bidding procedure to uncertainty and undermines the competitive bidding process. See, *e.g., State ex rel. Coleman v. Munger* (1948), 84 Ohio App. 148, 152, 39 O.O. 170, 172, 83 N.E.2d 809, 811

("Whether the bidding was competitive must be tested by the bids submitted at the time they were opened"). Thus, even accepting the fact, as noted by MCI, that the current rates at the time of the bidding were subject to possible waiver by the PUCO, we are unable to conclude that Franklin County acted unreasonably in evaluating the bids in accordance with the schedule of allowed rates on file with the PUCO as of the time the bids were opened.[2]

Furthermore, in addition to its concern that MCI's surcharges were not in compliance with the PUCO's rules, Franklin County also took into consideration other factors related to the bid criteria in determining the highest and best bid. Specifically, during the evaluation process Franklin County expressed concern that MCI could not meet the bidding requirement that commissions were to be paid by the fifteenth of each month; further, Franklin County, in considering the issue of which carrier could best meet the service needs of the county, found Ameritech's proposal to be more favorable than MCI's proposal. Those concerns were set forth in a letter from Ron Neutzling, the Director of Public Facilities Management, to Franklin County Administrator Jeff Cabot. The letter stated:

"MCI's inability to fully achieve other requirements/ criteria of the ITB has also affected the committee's decision. First is the responsiveness of the contractor to problem areas. Though MCI does have a local service office in Dayton, Ohio (with three inmate phone service technicians for the state), Ameritech has a service office located in Columbus, Ohio. Ameritech has assured us that they will make provisions for a technician to visit one Franklin County Correctional Facility each day to check for service problems. We feel this is added insurance that Ameritech will be able to adhere to our 24 hour response time requirement. The second issue deals with the 'Terms of Revenue Payments' requirement of the ITB. MCI stated in their bid that it would be impossible for them to bill and collect the previous months service by the 15th of each month. However, Ameritech stated in their bid response that this would not be a problem."

Regarding the issue of required payment of commissions by the fifteenth of each month, the record indicates that MCI provided in their response to the ITB

---

**2.** We find unpersuasive MCI's contention that its proposed $2.50 surcharges did not exceed those of Ameritech on the date the contract was awarded because of the fact that on June 6, 1997, Ameritech received approval by the PUCO for a proposed "AICS" tariff, authorizing a $2.50 surcharge for certain inmate services. The evidence indicated that the proposed AICS tariff included enhanced services not requested under the ITB, and that the approved $1.10 surcharge for the services listed in the ITB remained in effect. Jon Kelly, former chairman of the PUCO, testified that "Ameritech could not charge $2.50 for operator service unless it is this particular service, Ameritech inmate calling service, as described in the tariff." Andre Gregory stated that Franklin County "didn't consider this enhanced service * * * as something we would recommend. We * * * were going with what we had on the bid opening date."

that while "[a]ll commission owed to Franklin County will be * * * paid as quickly as possible * * *, due to outclearing of billing records from the Local Exchange Carriers, it is sometimes impossible to account for all gross billed revenue for the prior month's usage and, thus, commission owed is sometimes paid in arrears." As to the issue of providing service for the inmate phones, the record shows that the service contractor representing MCI was located in Dayton. Ameritech, however, had a service office in Columbus, and the company indicated that it would send a service technician each morning to the facility. Franklin County Administrator Jeff Cabot testified that the issue of service, while not the county's primary concern, was nevertheless an important consideration in evaluating the bids. Specifically, Cabot stated at trial:

"There are more concerns than just the dollars, particularly in this contract.

"One of the County's responsibilities, of course, is to operate the jail and to provide the services necessary to the inmates. And I know that Mr. Neutzling has a continuing problem with the inmate pay phones being torn up particularly while we have the main jail closed and the double bunking at the other jail. So service on a contract like this would be important; not as important as the dollars, I suppose, but a significant consideration."

In making its decision as to the highest and best bidder, Franklin County was not required to award the contract to MCI merely because it submitted a bid offering the highest percentage commission rates. See *Cedar Bay Constr., supra.* Rather, while the determination of the highest bid is ministerial in nature, the issue of "[w]ho is the 'best' bidder is not susceptible of definition, and in such cases the matter is left to the discretion of the officers awarding the contract." 10 McQuillin, Municipal Corporations (3 Ed.) 504–505, Section 29.73.05. In the present case, the record indicates that the bids were evaluated on the basis of criteria set forth in the ITB; Franklin County, while noting that MCI had submitted higher commission rates, determined that MCI's bid was not the best based on concerns pertaining to MCI's proposed rates, responsiveness, and payment schedule. In light of the factual record, we find no abuse of discretion by Franklin County in its decision to award the contract to Ameritech.

MCI also asserts that Franklin County abused its discretion by introducing an unannounced fairness requirement into the bidding process. MCI's contention is apparently based on the deposition testimony of Franklin County employee Andre Gregory, who indicated that in preparing the ITB, he was concerned about keeping down the cost to inmates' families.

In response, Franklin County argues that it was MCI's failure to comply with the bid specifications, rather than the use of a fairness criterion, that resulted in MCI not being awarded the contract. Franklin County contends that, to the extent there was a concern about high costs to consumers, that issue was

implicitly addressed under the terms of the bid specifications requiring that the rates not exceed those allowed by the PUCO. Upon review, we agree with Franklin County that the record fails to show that the award of the contract to Ameritech was the result of an unannounced fairness criterion.

We also find no merit to MCI's contention that Franklin County abused its discretion by relieving Ameritech of its obligation to meet the "gross billed revenue" requirement of the ITB. Specifically, MCI argues that language in Ameritech's bid was equivocal as to this requirement, stating that commission payments would be processed based on "Ameritech's Generated Revenue."

The record shows, however, that Ameritech's bid response specifically provided that "Ameritech agrees to quote a flat monthly percentage of monthly gross revenues billed each month of the contract." We further note that MCI, in support of its argument, relies on a draft memo, prepared by Franklin County employee Kenneth R. Williams, in which Williams indicated that "Ameritech offers 45% of only the revenue that it actually collected." However, Williams noted in his deposition testimony that his initial draft contained errors, and the record reflects that a revised version of the memo was subsequently issued, stating that "Ameritech offers 45% of the total gross billed revenue." Upon review of the record, we conclude that MCI failed to present sufficient evidence showing that Ameritech was relieved of the gross-billed-revenue requirement as set forth under the terms of the ITB.

Based upon the foregoing, MCI's single assignment of error is not well taken and is overruled. In light of our disposition of MCI's assignment of error, the issue raised under Ameritech's conditional cross-assignment of error is rendered moot.

Having overruled MCI's single assignment of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

JOHN C. YOUNG and CLOSE, JJ., concur.